**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2687-24

HOWARD JORDAN
GUENTHER JR.,

     Plaintiff-Respondent,

v.

REDCOM DESIGN &
CONSTRUCTION LLC,

     Defendant-Appellant,

and

GREGORY J. REDINGTON,

     Defendant.

_____

Submitted March 19, 2026 – Decided April 2, 2026

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2516-20.

Gordon Rees Scully Mansukhani LLP, attorneys for appellant (Douglas E. Motzenbecker, of counsel and on

the briefs; Peter Siachos, of counsel; Matthew Gallo, on the briefs).

Jacobowitz Newman Tversky LLP, attorneys for respondent (Evan M. Newman, on the brief).

PER CURIAM

Defendant Redcom Design & Construction LLC appeals from a March 20, 2025 judgment entered against it and in favor of plaintiff Howard Jordan Guenther, Jr. We affirm.

This matter was subject to a three-day bench trial. We take the facts from the trial record.

Plaintiff sued defendant and its president, Gregory J. Redington, for breach of contract, legal fraud, equitable fraud, and breach of the covenant of good faith and fair dealing. The dispute concerns whether plaintiff was entitled to a bonus as the senior project manager on two projects, namely: the construction of a warehouse building on Paterson Plank Road in Carlstadt; and the renovation of an auto dealership.

In addition to his salary, plaintiff negotiated a bonus compensation agreement (Agreement), which was drafted by defendant's chief operating officer (COO). The Agreement provided as follows:

> With this program, [defendant] is offering the Senior Project Manager[ (SPM)] a [twenty-five percent] bonus

for any "Additional Profits" ABOVE the company targeted profit for each project. "Additional Profits" are the difference between the "Cash In" and "Cash Out" on the final accounting of the project job cost. The final accounting of job costs will include all payments to/for subcontractors, suppliers[,] and materials for the project, direct payroll for Super, [Assistant Project Manager (APM)], [Project Manager (PM)], Architects & Engineers, and HQ, Insurance and Profits as itemized in the final contract budget estimate.

In order to receive the entire [twenty-five percent] bonus, the THREE criteria below must be met. If all of the criteria are not met then a reduction in the bonus will be calculated at the end of the project.

The [twenty-five percent] bonus is based on the amount of Additional Profit above the expected . . . profit for each project a [S]PM completes. 100% of the [twenty-five percent] bonus is pending the criteria below.

The [twenty-five percent] Bonus program will be based on [three] different criteria.

> 1. [Thirty-three percent]- Completion Date On Time- [defendant] will provide [thirty-three percent] of the expected [twenty-five percent] bonus if the completion date is met on time. This percentage will be provided if the project is completed on time or before the expected completion date based on the project budget timeframe and the original completion date provided to the Owner at the beginning of the project. The completion date will be adjusted due to change orders, unforeseen conditions[,] or owner delays. Date changes or missed

3

opportunities that move the completion date will be measured as well. The Final Completion Date will be based on the date [defendant] obtains the [temporary certificate of occupancy (TCO)] or [certificate of occupancy (CO)] on the project. This item is the final decision from the COO.

2. [Thirty-three percent]-Budgets/Operational- [defendant] will provide [thirty-three percent] of the expected [twenty-five percent] [b]onus if the Operational Goals are met. It is important that during the course of the project all deadlines are met for the following items:

    a) Invoicing to the owner, the invoices must be correct and sent to the owners by the [first] of each month.

    b) Change orders must be completed and received by the owner during the project. Not all at the end of a project.

    c) Team and Owner meetings must be attended, minutes must be taken.

    d) Man hour paperwork completed and reported, [m]onthly project schedule completed monthly and provided to the owner.

In addition communication must be acceptable on the project internally and

4

externally including any changes in project schedules. . . . This item is the final decision of the COO with input from Finance.

3. [Thirty-four percent]- Owner Satisfaction- [defendant] will provide [thirty-three (sic) percent] of the expected [twenty-five percent] bonus if the Owner is satisfied at turnover of the project at completion (TCO). [Defendant] receiving final payment is a condition of owner satisfaction. The [S]PM will work with the punch list crew to complete all punch list items at the end of the project. Site must be maintained and kept clean at all times. This item is the final decision of the COO.

All bonuses will be paid out at the end of each project after the final payments are received from the owners, all bills are paid and financing has completed the final profit calculations. The [S]PM must be an employee of [defendant] and involved in the current project at the end of the project (receipt of TCO and turnover) in order to receive partial or full bonus reward on any project.

As both projects neared their end, and while still working for defendant, plaintiff searched for a new job and accepted an offer from a new employer on October 15, 2019. Plaintiff submitted his formal resignation on December 18, 2019, indicating his last day would be January 15, 2020. He planned a vacation for the first two weeks of January. Defendant accelerated the resignation date

5

to December 31, 2019, paid plaintiff for his vacation time, and denied plaintiff his bonuses from both projects.

The Paterson Plank project was worth more than $10,500,000. In November 2019, the building was operational and occupied by its owner. On November 22, 2019, defendant issued a one-year warranty on the building, commencing November 14, 2019. The same month, defendant and the building owner held a ribbon cutting ceremony to celebrate the project's completion.

On a copy of plaintiff's signed Agreement, the COO handwrote "Paterson Plank close out," and gave plaintiff a percentage grade next to each of the listed bonus criteria, under which he wrote, "final grade 100% bonus." Below their original signatures, the COO and plaintiff signed the document and dated it December 6, 2019. A final CO was issued on December 9, 2019.

An issue arose with the concrete flooring on the mezzanine of the building, which caused the Paterson Plank project owner to withhold final payment. The issue predated plaintiff's departure and was summarized in an April 2, 2020 email sent from the COO to the owner representative:

> I am wondering why the final payment is being held up. The building is occupied and operational and has been for some time now[] (since November)[.] The TCO was received in November and the [CO] was received in December of 2019. The crack issue was brought up in October and we resolved [it] by repairing them in

6

November. The next we heard of any issues was the beginning of March which surpasses the time for payment. This work should be under a warranty work since the [CO] has been received and you are operating. . . . The unlevel slabs are under warranty and in a warranty period. . . . You have been occupying the building since November. The unevenness of the slabs was not brought up in the initial discussion between you and I when we were notified in March of your issues and now I am being told . . . [it] is an issue . . . . Again, this is a warranty issue. The entire retention of this project should not be held. . . . [A] partial payment should be made and you can hold the cost of repairs for the slab on the second floor.

The owner continued to withhold final payment at least through May 4, 2020.

As for the dealership, a logbook entry from the local municipal authority in charge of inspecting the property noted the building received a "pass" for the TCO on October 18, 2019. However, the official TCO certificate stated it was issued February 13, 2020. Photographs taken of the project site show the owner was using the new space as early as October 2019. On June 1, 2020, defendant issued a one-year warranty commencing January 31, 2020.

In addition to several exhibits, the trial judge considered the testimony of plaintiff, the COO, defendant's chief financial officer (CFO), Redington, defendant's APM, and the Paterson Plank owner representative. The judge issued a written opinion recounting the testimony and the evidence.

7

The judge found the Paterson Plank representative was "entirely credible" and credited his testimony:  the owner was happy with the project; the warranty was issued when the project was substantially complete; there was a ribbon cutting ceremony; and the owner was in full possession of the building.  The representative explained generally a verbal TCO permits the owner to move into the property, and the term "turnover" means the property is turned over to the owner for use.  The issue with the mezzanine cost $5,000 to fix.

The judge also credited most of plaintiff's testimony.  Although plaintiff negotiated the bonus Agreement, he did not have the document reviewed or make any changes to it.  He understood "additional profits" to mean the amount left after defendant paid its bills and overhead on a project.  Plaintiff testified his involvement on a project typically ceased after the issuance of a TCO and turnover meant to "turn the building over to the owner, get the TCO, so that the owner could use the building."  The judge noted, "[t]hese events were significant because they demarked the time when [defendant] would no longer be in exclusive control of the site."  Plaintiff further testified the TCOs or COs for the projects were obtained while he was still working for defendant.  The Paterson Plank owner had moved into the space, and the dealership owner was using the newly constructed space, albeit with some cosmetic issues.

A-2687-24

Plaintiff explained the Paterson Plank construction problems were due to the owner's use of heavy forklifts on the mezzanine causing the floor to crack, which was a warranty issue, not a construction issue. The judge observed, "[t]he problem was ultimately fixed for a comparatively small sum for installing additional supports," for which defendant agreed to pay "to end the dispute and obtain its final payment." As for the dealership project, the judge noted plaintiff was confronted with the February 2020 TCO but "could not explain why that copy is dated in February [2020] and the [municipality]'s log shows the TCO being issued" in October 2019.

The judge found plaintiff was not completely credible because he testified evasively about his job search, the new job's start date, and whether he was reachable during his vacation after his resignation. However, "those issues [were] immaterial to the issue before the court." Plaintiff was credible "[o]n the topics of his work, the permits associated with the work, the problems with the mezzanine[,] and his interactions with" defendant.

The CFO testified regarding defendant's costs, expenses, and profit from each project. Even though defendant used a computer program to do its accounting, the CFO calculated the profitability for both projects without it,

9

instead using Microsoft Excel. He had never conducted a calculation in this manner before and could not recall who asked him to prepare the calculation.

The CFO calculated the profit from the Paterson Plank project as $3,625,921. He was unfamiliar with the terms of the Agreement and did not follow the formula in it when he performed the calculations. The CFO created a second document, which split out the mezzanine change order from the Paterson Plank job because he "was asked to."

The CFO also prepared a document calculating the profit on the dealership project. Unlike his calculation for the Paterson Plank project, he accounted for budgeted profit in the dealership calculation, "[l]ikely" because "someone asked" him to include it. He admitted defendant would artificially deflate its projected profit on a project by inflating its projected costs in presentations to clients. The CFO also admitted had he used defendant's accounting program, it would have produced "a report that . . . would show estimated costs and actual costs, cash in, cash out, [and] profits," which would have shown higher profits. He claimed he was unaware the documents he prepared were for the litigation.

The judge found the CFO was not credible. The testimony "he was not aware of plaintiff's claims or of the [Agreement] at the time he prepared [his calculations] simply defie[d] common human experience." The judge also

A-2687-24

rejected the CFO's testimony he was unaware of the reason why he prepared the calculations for each project. It was "extremely unlikely that [Redington], [the COO], and [the CFO] did not go through various scenarios regarding plaintiff['s] claims in detail. This is especially so since the accounting department was essentially [the CFO] and one assistant in this closely held company."

The CFO's testimony left "the impression that [defendant] is able to manipulate the numbers on any particular job to affect a reporting result." The judge rejected the CFO's testimony.

The COO testified he devised and drafted the Agreement with Redington's assistance. Defendant's lawyers did not review the document, and the COO did not discuss it with the CFO. The COO claimed he gave plaintiff a grade of 100% because plaintiff feared Redington would not pay him a bonus on the Paterson Plank project. He then asserted he was "duped" into grading plaintiff because plaintiff did not reveal he was leaving the company. The judge recounted the COO "saw no reason why plaintiff should not get the bonus, so he completed the document" and observed he never complained about allegedly being duped, protested the bonus payment, or "retract[ed] his December 6, 2019 grading."

According to the COO, under the Agreement, turnover meant "final payment." The judge noted "[h]e offered no explanation . . . why the term 'final

11

payment' was not used [in the Agreement] in defining the 'end of the project' instead of 'receipt of TCO and turnover.'" The COO also claimed the warranty should not have issued, but the judge noted he "was confronted with his own email . . . to the Paterson [Plank] client wherein he questioned why final payment had not yet been made."

The COO did not grade plaintiff on the dealership project because defendant did not receive the TCO until February 2020. The judge noted the COO conceded the dealership was operating during construction and "[t]he only work that created a new space was the new customer service area."

The judge concluded the COO "was not a credible witness[ and m]uch of his testimony was contrived. His position regarding 'final payment' equating to 'turnover' ma[de] no sense given the language in the [Agreement] he drafted as well as his email to the . . . Paterson client." The judge found the COO's testimony gave the impression he worked with Redington on his testimony despite his denials. The judge rejected the COO's testimony.

The APM testified the Paterson Plank project was complete and in the client's possession by November 2019. The dealership project only had cosmetic issues remaining, and the owner occupied the area constructed at the time of plaintiff's departure. He explained turnover means a client occupies the

space, and the work is under warranty. The warranty is issued from the date the TCO is received. The TCO must issue for a client to occupy a space. He understood the dealership had a TCO before it occupied the property.

The APM recalled the mezzanine floor of the Paterson Plank project was damaged because the client used heavy forklifts on it, knowing it could not bear the weight. The client did not want to pay to fortify the floor.

The APM testified both projects were profitable and defendant typically aimed for ten-to-fifteen percent profit. Defendant's computing software could readily track profitability. The Paterson Plank project realized $1.2 million, and the dealership garnered $200,000 to $300,000 of additional profit. The judge credited the APM's testimony. He "was an entirely credible witness."

Redington was the final witness. He explained he devised the idea of the Agreement and its twenty-five percent additional profits threshold. Although Redington did not review the Agreement, he directed the COO to include the preconditions plaintiff had to be employed by defendant and defendant must receive final payment before a bonus could be paid.

Redington's testimony relied on various exhibits, which purported to show the company's overhead, profits, and in turn what bonus it owed to plaintiff. The judge found Redington's testimony was inconsistent; "he had difficulty

13

explaining the concepts he was promoting—often having to stop because he had confused himself." He rejected the documents Redington relied upon to show the profit and overhead on the Paterson Plank project because they were "clearly post-hoc creations made for the purposes of litigation." Regardless of when the documents were prepared, the judge found the overhead and profit figures changed from one document to another, and Redington was unable to explain the incongruity. The judge recounted Redington testified "none of the numbers [were] correct" in another set of documents created at Redington's request after the filing of plaintiff's lawsuit.

Redington also offered the following explanation about what he considered to be a turnover:

> So, . . . it means basically, essentially turning over a new leaf, getting everything that's done for a project cleaned up, you wipe your hands of it, you put it away in archives and it's over.

> Other words are close out. Other words are . . . job completion. But essentially for a general contractor it's when everything is done, and the most important thing of everything is the money. That's why we wake up in the morning and do business.

> So[,] we have to have the money. But then after that we need to pay our obligations, so we would need to pay all our sub[-contractors]. Then we need to make sure that everyone is happy, and no one is going to have

14

any problems later. So[,] there are releases that go all over the place.

Based on this definition, Redington testified the dealership turnover was likely in April 2020, one month after the owner made final payment. The Paterson Plank turnover occurred one month after defendant received the final payment in July 2020. Redington testified there was no such thing as a verbal TCO. He denied plaintiff's testimony turnover occurred when the TCO issued, because there is usually more work to be performed at that point, including collecting final payment. Although Redington conceded an owner could occupy the building when a TCO issued, owner occupancy had no bearing on the payment of plaintiff's bonus. Defendant did not pay plaintiff because defendant did not employ him when each client made their final payment.

The judge concluded Redington "was an absolutely incredible witness. Not only was he unable to explain the calculations he promoted with any reliability, but his substantive testimony . . . defied common experience and common sense." Redington's "idea that 'turnover' in the [A]greement meant 'turning over a new leaf' is simply preposterous." The judge also concluded Redington "endorse[d] the practice of [defendant] providing false estimates to its potential clients . . . and his company appears ready to be 'fast and loose' with its accounting in any given situation." Regardless of whether this was standard

15

practice in the construction industry, it did not enhance defendant's credibility. The judge rejected Redington's testimony.

Addressing the merits, the judge began by looking to the Agreement, specifically the provision which read:  "The [S]PM must be an employee of [defendant] and involved in the current project at the end of the project (receipt of TCO and turnover) in order to receive partial or full bonus reward on any project."  This provision had two interpretations.

The first interpretation would read the provision literally and meant "plaintiff's claim would fail because it is admitted that he was not an employee [of defendant] after December 31, 2019[,] and it is admitted that final payments were not received by the clients before that date."  However, the judge found the second interpretation "advanced by plaintiff and apparently accepted by the defense," more plausible.  This was

> to read the sentence . . . to have the temporal term "at the end of the project" apply to plaintiff's employment status and involvement in the project.  This reading would provide the bonus if plaintiff was an employee and involved in the project at the end of the project (receipt of TCO and turnover).

Pursuant to the blackletter law, the judge concluded any ambiguity in the Agreement would be construed against defendant because it drafted the Agreement.  So, the judge applied the second interpretation.

A-2687-24

The judge rejected defendant's interpretation turnover required receipt of the final payment because this meant he "would have to reject the plain meaning of the word turnover and equate it with 'final payment[,]' which is used independently within the [A]greement." Accepting this interpretation would also require the judge to find the COO and Redington credible, which the judge declined to do.

The judge found "'end of project' means when a TCO has been issued and turnover has occurred." The bonuses were, therefore, payable because "[b]oth of these eventualities had occurred on each project by the time plaintiff was terminated." The judge reasoned, since a TCO precedes the issuance of a CO and the CO issued for Paterson Plank on December 9, 2019, the TCO issued well before plaintiff left his employment. The Paterson Plank building was turned over to the client in November 2019, and a warranty issued the same month.

The judge rejected the COO's claims of being duped because he gave plaintiff a final grade of 100% "while knowing of the issues with the mezzanine." The COO's "expression of plaintiff's satisfaction of conditions precedent in the . . . [A]greement was genuine." The judge also rejected the argument the Agreement required plaintiff to be employed with defendant when

A-2687-24

the bonus was paid or when a client made the final payment because the Agreement had no such temporal mandate.

The judge reached a similar conclusion regarding the bonus associated with the dealership project. He found "the TCO was issued on the project, and the client took possession of the new space while plaintiff was still employed" with defendant. The judge relied on the municipal records for the TCO issuance, which showed a TCO was logged in the records on October 18, 2019, and the fact the client was in possession of the newly constructed space the same month.

The judge concluded plaintiff was entitled to an award of damages on the breach of contract claim. The Paterson Plank contract price was $10,531,195 and the costs were $6,666,291, yielding an actual profit of $3,864,904. This number was reduced further by overhead of $948,327, yielding an increase in profit of $2,916,577. Pursuant to the Agreement, the bonus was twenty-five percent of the increase in profit, or $729,144.

The bonus for the dealership project was calculated in a similar manner. The contract price was $2,192,892, less change orders of $98,541 and the project cost of $1,163,487, yielding an actual profit of $930,864. This figure was reduced by overhead of $516,897, resulting in an increase in profit of $413,967. Plaintiff's bonus was twenty-five percent of this figure, or $103,492.

A-2687-24

On April 14, 2025, the judge entered final judgment against defendant for $973,462.06 comprised of damages and pre-judgment interest. This appeal followed.

I.

"Our review of a judgment following a bench trial is limited." Accounteks.Net, Inc. v. CKR L., LLP, 475 N.J. Super. 493, 503 (App. Div. 2023). "[F]indings [of fact] by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). We must defer to credibility determinations "[b]ecause a trial court 'hears the case, sees and observes the witnesses, . . . hears them testify,' [and] has a better perspective than a reviewing court in evaluating the veracity of witnesses." Id. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)) (internal quotation marks omitted).

Questions of law, however, are reviewed de novo. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). The same is true for issues of contract interpretation; we "pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011).

Defendant argues plaintiff did not earn his bonuses because he failed to complete the projects or receive owner sign-off before his resignation. Plaintiff went on vacation, leaving others to complete both projects and address issues that arose with the construction. Despite assuring Redington he was committed to working for defendant, in bad faith, plaintiff accepted a job offer from another employer soon after signing the Agreement. Defendant reiterates plaintiff was not entitled to the bonus because defendant had not received full payment from the clients before plaintiff left.

Defendant asserts the damages calculations were wrong and awarded plaintiff more than he demanded. Plaintiff's pretrial disclosures alleged damages totaling no more than $360,297.50. He then arbitrarily increased his claim to $481,783 at the end of trial, without ever having produced an amended calculation in discovery as required by Rule 4:17-7.

Defendant argues plaintiff is entitled to no recovery from the dealership project. Also, the judge overstated its profit from the Paterson Plank project and ignored Redington's testimony profit margins in the construction industry were in the single digits. The judge erroneously relied on an interim billing summary to conclude the cost of the Paterson Plank job totaled $6,889,675, which is

$1,496,293 less than the true total of $8,385,968. This resulted in plaintiff receiving an additional $247,361 in damages to which he was not entitled. The judge did not catch an error in plaintiff's post-trial submission, which materially understated the overhead for the Paterson Plank project, and resulted in the unfair enhancement of plaintiff's damages. Defendant requests we either vacate the damage award for the Paterson Plank project or limit it to no more than $346,500.

## III.

Having considered the record under our standard of review, we affirm the judge's rulings substantially for the reasons expressed in his thorough and well-written opinion. R. 2:11-3(e)(1)(E). We add the following comments about the dealership project bonus.

As we recounted, the trial judge found a TCO was issued for the dealership prior to plaintiff's departure, based on a municipal record that logged the TCO as "pass[ed]" on October 18, 2019. The TCO certificate bore a different issuance date of February 13, 2020, which was after plaintiff's last day of employment.[1] Although the judge's opinion did not explicitly discuss the discrepancy between

---

[1] Although it is not determinative, we note defendant confronted plaintiff with both exhibits during cross-examination, yet none of defendant's witnesses were shown or testified to these documents.

A-2687-24

both exhibits, he parsed them by explaining the evidence supported plaintiff's claim the dealership received its TCO in October 2019 because it was corroborated by plaintiff's credible testimony and a picture in evidence showing the owner occupied the space defendant constructed for it.

An abuse of discretion occurs when a trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). The judge's findings and reasoning regarding receipt of the dealership TCO were rationally explained and based on the evidence presented at trial. R. 2:11-3(e)(1)(A). We decline to second guess those findings.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2687-24